Herman E. McMAHAN, Plaintiff,

v.

INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL & ORNA-MENTAL IRON WORKERS, Iron Workers Union Local 601, and South Carolina National Bank, Defendants.

Civ. No. 2:91–3839–18.

United States District Court, D. South Carolina, Charleston Division.

June 27, 1994.

Mark Stokes, North Charleston, SC, for plaintiff.

Terry Rickson, Charleston, SC, Sandra Benson, Victor Van Bourg, San Francisco, CA, Stanley McGuffin, Charleston, SC, for defendants.

## ORDER

NORTON, District Judge.

### I. INTRODUCTION

This matter is before the court on three motions for summary judgment. Plaintiff Herman McMahan filed actions in 1989 and 1991 based on the same set of facts; the actions were consolidated after removal of one from state court. Out of the consolidated cases are six causes of action by McMahan. On four of these, he seeks summary judgment: (1) violation of § 504(d) of the Labor–Management Reporting and Disclosure Act of 1959 (LMRDA); (2) conversion; (3) breach of fiduciary duty; and (4) breach of contract. Defendants International Association of Bridge, Structural & Ornamental Iron Workers (the International) and Iron Workers Union Local 601 (Local 601) also move for summary judgment against McMahan on four (a different four) of his six causes of action: (1) the § 504(d) violation; (2) conversion; (3) interference with economic relations; and (4) civil conspiracy. Defendant South Carolina National Bank (SCN) moves for summary judgment against McMahan on yet a different foursome: (1) the § 504(d) violation; (2) conversion; (3) breach of fiduciary duty; and (4) civil conspiracy.[1]

At the hearing on this matter, the court discovered a potential conflict of interest in presiding over this matter.[2] Upon disclosure

---

1. The court also heard three other related motions for summary judgment. The motion by Defendant SCN for summary judgment on its cross-claims against co-defendants has been denied without prejudice. The cross-motions for summary judgment in Plaintiff's case against the Southern Iron Workers Pension Fund and Board of Trustees (filed in 1992) are still pending and are to be considered at the same time as the remaining issues in this case.

2. Judge Norton's 13– and 16–year–old daughters own stock in Wachovia, which has taken over

of the potential conflict, all parties requested that the court continue to hear the matter, at least on the issue of the § 504(d) violation. Therefore, this court has considered the three motions for summary judgment only to the extent they address § 504. The cross-motions on McMahan's other five causes of action have not been considered.

## II. FACTUAL BACKGROUND

During 1981, the Federal Bureau of Investigation commenced an investigation of McMahan and other individuals related to job selling in violation of federal labor laws. During 1984, McMahan, along with Charles Price, Robert McClearn, William Rowe, and Mary O. Thompkins, were indicted by a federal grand jury for embezzlement, mail fraud, and conspiracy to commit mail fraud in violation of 29 U.S.C. § 501(c) and 18 U.S.C. § 371 & § 1341.

The indictment stemmed from the activities of McMahan's business relationship with Iron Workers Union Local 601 (Local 601). McMahan was the elected Business Manager for Local 601 in Charleston, South Carolina. As such, he was responsible for collecting a fee from new members. The indictment alleged that McMahan and others charged a fee that greatly exceeded the union's actual assessment and then pocketed the difference.

A jury trial was conducted before the Honorable C. Weston Houck, and, on November 12, 1984, McMahan was found guilty on 23 counts. On January 21, 1985 (prior to being sentenced), McMahan, acting in his capacity as Business Manager for Local 601, purported to appoint George P. Simmons, Jr. to act as Business Manager at no salary. At the time, Simmons was President of Local 601. However, between January 21, 1985 and October 15, 1986, McMahan, who remained free on personal recognizance bond, continued to perform some of the duties of Business Manager. The nature and extent of his activities is subject to dispute.

On January 29, 1985, McMahan was sentenced to one year imprisonment. By letter of January 30, 1985, the Department of Justice informed Local 601 and its parent union, the International, that, under 29 U.S.C. § 504(a), McMahan was immediately barred from his job as a union officer. At that time, McMahan requested that Local 601 place his salary into escrow pending appeal.

Local 601 failed to comply with the escrow requirement for McMahan. Therefore, on March 7, 1985, McMahan, on advice of counsel, opened an account with SCN entitled "Herman E. McMahan, Escrow Account." The purported purpose of the account was to comply with 29 U.S.C. § 504(d), which required Local 601 to escrow funds it would have otherwise paid McMahan while he appealed his criminal conviction. McMahan had his paychecks deposited into the account until he went to jail (October 15, 1986).

On March 29, 1985 (after the account was opened), the attorney representing McMahan in the criminal proceedings (Coming B. Gibbs) sent SCN a letter advising SCN that Plaintiff needed to establish an escrow account and that the only authorized signature on the account should be George Simmons. A copy of this letter was forwarded to Local 601.

On or about May 14, 1985, an employee of SCN advised McMahan that he could not keep an escrow account at SCN in his own name and also be the signatory on the account. Based upon this discussion with SCN, McMahan changed the name of the account to "Herman E. McMahan, Special Account" and executed a new signature card to effect the change. McMahan was the only signatory to appear on SCN's records for this account.

After his conviction but before his incarceration, McMahan purchased an automobile with Local 601's funds. The automobile was placed in the name of Herman McMahan, care of Local 601. Also, on a number of occasions, McMahan withdrew funds from the "special account," which he used either to live on or to pay attorneys' fees. McMahan withdrew $3,000 on November 4, 1985; $1,000 on November 6, 1986; $3,000 on April 21, 1986; and $2,500 on June 17, 1986.

Meanwhile, McMahan was appealing his conviction. In October 1986, the Fourth Cir-

South Carolina National Bank, a defendant in this case.

cuit reversed the embezzlement convictions, but affirmed the mail fraud convictions. *United States v. Price,* 788 F.2d. 234 (4th Cir.1986). On October 15, 1986, McMahan began serving his sentence.

On October 20, 1986, George Simmons appointed Johnny M. Phillips to the Local 601 office of Financial Secretary, Treasurer, and Business Agent to fill McMahan's unexpired term, which was scheduled to expire on September 30, 1987.

Eventually, Local 601 became aware that McMahan had withdrawn a portion of the $41,706.32 in the SCN account. On December 3, 1986, financially-strapped [3] Local 601 withdrew the balance of the "Herman E. McMahan, Special Account" without McMahan's authorization. SCN gave Simmons a cashiers check, which stated it was for Local 601, in the amount of $32,206.32 and payable to "International Association of Bridge, Structural and Ornamental Iron Workers." The check was subsequently endorsed by the payee and deposited into an account of the International to pay back dues owed by Local 601.

On June 26, 1987, the United States Supreme Court vacated the Fourth Circuit's judgment and remanded the case for further consideration in light of *McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), which holds that the mail fraud statute does not apply to deprivations of intangible rights, such as good government or honest leadership. *McMahan v. United States,* 483 U.S. 1015, 107 S.Ct. 3254, 97 L.Ed.2d 754 (1987). On remand, the Fourth Circuit overturned the mail fraud convictions. *United States v. Price,* 857 F.2d 234 (4th Cir.1988). The Fourth Circuit recognized that McMahan could have been prosecuted for defrauding union members of money and that the government was free to seek a new indictment, but the government did not renew its efforts to prosecute McMahan. Thus, upon issuance of the second decision by the Fourth Circuit (the 1988 decision), all of McMahan's convictions were overturned.

During the pendency of McMahan's appeal, Local 601 did not attempt to terminate his term of service as Business Manager. On December 19, 1988, McMahan, acting through counsel and pursuant to § 504(d), demanded payment of $109,365.69 from Local 601. This amount represented the salary Local 601 should have escrowed from November 12, 1984, the date of McMahan's conviction, through September 30, 1987, when his term of office expired. On December 28, 1988, Local 601, through counsel, denied McMahan's request based on its belief that § 504(d) was unconstitutional and on the impropriety of McMahan's actions in taking for his own use monies from the earlier established bank account. In addition, Local 601 demanded that McMahan return all monies withdrawn by him between the date of his conviction and the present time. McMahan refused to return such monies.

## III. PROCEDURAL BACKGROUND

On May 9, 1989, McMahan filed suit against Local 601 and the International (the Union Defendants), contending that he is entitled, pursuant to § 504(d), to all salary due him by virtue of his position as Business Manager for Local 601.[4] The Union Defendants moved for summary judgment, arguing that § 504(d) is unconstitutional, that McMahan lacked standing to bring the suit, that the action was barred by the statute of limitations, and that the International was not subject to § 504(d).

On October 23, 1990, a magistrate judge recommended that summary judgment be granted in favor of the Union Defendants on the § 504(d) claim because no private right of action existed to enforce this provision. Further, the magistrate judge recommended that the International be granted summary judgment on the additional ground that the International was not McMahan's employer and thus not subject to the provisions of § 504(d). This court adopted the magistrate judge's recommendation on February 11, 1991, *McMahan v. International Ass'n of*

---

3. Local 601 went into receivership because of its poor financial condition.

4. Plaintiff's 1989 suit also named George Simmons as a defendant. However, Plaintiff entered a voluntary nonsuit as to Simmons upon Simmons' death.

*Bridge, Structural and Ornamental Iron Workers,* 800 F.Supp. 1337 (D.S.C.1991), and McMahan appealed. On June 1, 1992, the Fourth Circuit held that McMahan has an implied private right of action against Local 601, but affirmed summary judgment in favor of the International. *McMahan v. International Ass'n of Bridge, Structural and Ornamental Iron Workers,* 964 F.2d 1462 (4th Cir.1992). The Fourth Circuit remanded the case for this court's consideration of the other issues raised with respect to Plaintiff's § 504(d) claim—namely, whether the provision is constitutional and whether this suit was timely filed.

In November of 1991, after this court had ruled that McMahan had no private right of action but before the Fourth Circuit had partially reversed that decision, McMahan filed a second action related to his troubles with Local 601. In state court, McMahan alleged causes of action against SCN for breach of fiduciary duty and breach of contract; against Local 601 and the International for conversion and interference with economic relationship; and against all three defendants for civil conspiracy. The 1991 action was removed to federal court and consolidated with the 1989 (§ 504) suit after the 1989 was remanded from the Fourth Circuit.

Thus, as noted in the introductory section of this order, there are six causes of action in McMahan's consolidated 1989 and 1991 suit; but because of a potential conflict of interest regarding SCN, the only cause of action currently being addressed is the § 504 violation. Before this court for consideration now are two issues pertaining to § 504(d)—constitutionality and statute of limitations—as well as the defense of res judicata offered by the International.

## IV. STANDARD FOR SUMMARY JUDGMENT

To grant a motion for summary judgment, this court must find that "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The judge is not to weigh the evidence, but rather to determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). If no mate-

rial factual disputes remain, then summary judgment should be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which the party bears the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). All evidence should be viewed in the light most favorable to the nonmoving party. *Perini Corp. v. Perini Constr., Inc.,* 915 F.2d 121, 123–24 (4th Cir.1990); *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. CenTra, Inc.,* 947 F.2d 115, 119 (4th Cir.1991); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986).

## V. ANALYSIS

### A. THE CONSTITUTIONALITY OF SECTION 504(d) OF THE LMRDA

Assessing the constitutionality of an Act of Congress has been called "the gravest and most delicate duty" that a court must perform. *Walters v. National Ass'n of Radiation Survivors,* 473 U.S. 305, 319, 105 S.Ct. 3180, 3188, 87 L.Ed.2d 220 (1985), (quoting *Rostker v. Goldberg,* 453 U.S. 57, 64, 101 S.Ct. 2646, 2651, 69 L.Ed.2d 478 (1981)). Federal courts "customarily must pay [deference] to the duly enacted and carefully considered decision of a coequal and representative branch of our Government," *Walters,* 473 U.S. at 319, 105 S.Ct. at 3188, and it is with this caution in mind that this court considers the following arguments.

Defendants contend that 29 U.S.C. § 504(d) violates the Fifth Amendment of the United States Constitution because it constitutes a taking of private property for public use without just compensation, a deprivation of property without substantive or procedural due process of law, and a denial of the

equal protection implied in the Fifth Amendment's Due Process Clause.[5]

Section 504, entitled "Prohibition against certain persons holding office," provides in relevant part:

### (a) Membership in Communist Party; persons convicted of robbery, bribery, etc.

*No person who is or has been a member of the Communist Party or who has been convicted of . . . robbery, bribery, extortion, embezzlement, grand larceny, [or] any felony involving abuse or misuse of such person's position or employment in a labor organization . . . to seek or obtain an illegal gain at the expense of the members of the labor organization . . . shall serve or be permitted to serve—*

> *(1) as a consultant or adviser to any labor organization,*
>
> *(2) as an officer, director, trustee, member of any executive board or similar governing body, business agent, manager, organizer, employee, or representative in any capacity of any labor organization . . .*

*during or for the period of thirteen years after such conviction or after the end of such imprisonment, whichever is later, unless the sentencing court on the motion of the person convicted sets a lesser period of at least three years after such conviction or after the end of such imprisonment, whichever is later. . . . No person shall knowingly hire retain, employ, or otherwise place any other person to serve in any capacity in violation of this subsection.*

### (b) Penalty for violations

*Any person who willfully violates this section shall be fined not more than $10,000 or imprisoned for not more than five years, or both.*

### (c) Definitions

*For the purpose of this section—*

*(1) A person shall be deemed to have been "convicted" and under the disability of "conviction" from the date of judgment of the trial court, regardless of whether that judgment remains under appeal. . . .*

### (d) Salary of office or position of persons convicted placed in escrow

*Whenever any person—*

*(1) by operation of this section, has been barred from office or other position in a labor organization as a result of a conviction, and*

*(2) has filed an appeal of that conviction, any salary which would be otherwise due such person by virtue of such office or position, shall be placed in escrow by the individual employer or organization responsible for payment of such salary. Payment of such salary into escrow shall continue for the duration of the appeal or for the period of time during which such salary would be otherwise due, whichever period is shorter. Upon final reversal of such person's conviction on appeal, the amounts in escrow shall be paid to such person. Upon the final sustaining of such person's conviction on appeal, the amounts in escrow shall be returned to the individual employer or organization responsible for payments of those amounts. Upon final reversal of such person's conviction, such person shall no longer be barred by this statute from assuming any position from which such person was previously barred.*

The challenged provision—§ 504(d)—is inextricably interwoven with § 504(a). Subsection (a) bars certain individuals convicted of certain offenses from holding office in a labor organization for 13 years. And subsection (d) mandates that when an individual disabled from holding union office appeals from his or her conviction, the organization responsible for paying the salary to that individual must place such salary into an escrow account for the duration of the appeal or for a period of time during which such salary would be otherwise due, whichever period is

---

**5.** The Fifth Amendment to the United States Constitution provides that "[n]o person shall be . . . deprived of life, liberty, or property without due process of law; nor shall private property be taken for public use without just compensation." A party need not be a "natural person" to assert a Fifth Amendment right since "it is indisputable that the Fifth Amendment shields corporate as well as individual property against federal action in violation of the Due Process clause." *Marshall v. Kleppe,* 637 F.2d 1217, 1221 (9th Cir. 1980) (and cases cited therein).

shorter, to be either paid to the individual or returned to the union treasury at the end of the appeals process.

■ While it is undisputed that Congress has the power to legislate with respect to the internal affairs of unions, Congress may not exercise its power in such a manner as to violate the specific provisions of the Constitution: "[T]he Constitution is filled with provisions that grant Congress or the States specific power to legislate in certain areas; these granted powers are always subject to the limitation that they may not be exercised in a way that violates other specific provisions of the Constitution." *Williams v. Rhodes*, 393 U.S. 23, 29, 89 S.Ct. 5, 9, 21 L.Ed.2d 24 (1968).

■ Nevertheless, a statute should be construed so as to avoid any constitutional invalidation where possible. *Anderson v. Babb*, 632 F.2d 300 (4th Cir.1980). Thus, if any constitutionally defensible interpretation of an act of Congress may be found, that interpretation must be adopted in order to preserve the statute. *Concrete Pipe & Prods., Inc. v. Construction Laborers Pension Trust*, — U.S. ——, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993).

### 1. The Legislative History of § 504(d) of the LMRDA

Both the debarment provision of § 504(a) and the escrow provision of § 504(d) were parts of the 1984 amendments to § 504 of the LMRDA. The 1984 amendments were enacted as Chapter VIII of the Comprehensive Crime Control Act of 1984. Pub.L. No. 98–473, 98 Stat. 1837.

■ The purpose of the debarment provision is clear: Congress sought to protect union members from corrupt officials. *See United Union of Roofers No. 33 v. Meese*, 823 F.2d 652, 655 (1st Cir.1987) (disqualification provision meant to create "strong barriers against the control of unions by unreformed convicted thieves, racketeers, and thugs"); *Harmon v. Teamsters, Chauffeurs*

*& Helpers Local Union 371*, 832 F.2d 976, 979 (7th Cir.1987) (§ 504(a) prevents persons who commit serious crimes from holding union office until a healthy period of time has elapsed); *Local 186, International Brotherhood of Teamsters v. Brock*, 812 F.2d 1235, 1238 n. 4 (9th Cir.1987) (disqualification fits legitimate legislative goal of curbing corruption in labor affairs). The purpose of the escrow provision, while not specifically delineated by the courts,[6] is also clear: Congress sought to protect the interests of a debarred union officer whose conviction was improperly obtained by the government and later reversed. *See infra* part V.A.3.b.

The Senate hearings in 1983 show that Congress determined that such provisions would strike an equal and effective balance of the competing interests of the union and its convicted member. Lane Kirkland, then president of the A.F.L.–C.I.O., endorsed the proposed amendments, including the escrow provision: "The sponsor's decision to provide the convicted defendant's salary will be held in escrow and paid to him if his appeal succeeds does tend to alleviate the harshest consequence of this suggested change in the law." *Labor–Management Racketeering Act of 1983: Hearings Before the Subcomm. on Labor of the Senate Comm. on Labor & Human Resources*, 98th Cong., 1st Sess. 184 (1983). The "suggested change" referred to by Mr. Kirkland was the debarment provision.

Senator Nickles, the Chairman of the Subcommittee on Labor of the Committee on Labor & Human Resources, stated in his opening remarks during the hearings on the enactment of § 504(d):

> This precludes someone found guilty of a felony from continuing to manage pension funds or a labor organization, or to engage in labor-management relations until he has exhausted all of his appeals, a process which can last for years. To soften this, all monies due such person are paid into escrow. If later found not guilty, such funds will be reimbursed.

---

**6.** The escrow provision—29 U.S.C. § 504(d)—has been the subject of litigation much less frequently than the disqualification provision. A previous attempt to challenge its constitutionality

failed when the Ninth Circuit found the issue unripe in *Local 186, International Brotherhood of Teamsters v. Brock*, 812 F.2d 1235, 1239 (9th Cir.1987).

*Id.* at 1. During the hearings, Senator Rudman probably stated the intent of Congress most succinctly in answering a question put to him by Senator Nickles:

> Sen. Nickles: "Opposition has also been heard on the escrow provisions. These payments have been criticized as being overly burdensome on unions who must pay for services not being rendered. Would you comment?"
>
> Sen. Rudman: "Mr. Chairman, of course, they would not receive the money unless they eventually won their appeal. Quite frankly, I think to be fair, it is necessary to include the provision. I believe we would lose a substantial amount of support for the bill if it were dropped.
>
> "It is a trade-off between the interests of the union members and the convicted official in the interest of justice and equity. On the one hand, the union should not be required to continue to pay the salary of a convicted official. But on the other hand, if the convicted official is eventually successful with his appeal, it seems to us that he should receive his pay."

*Id.* at 62.

The Union Defendants argue that the escrow provision of § 504(d) is nothing more than a compromise to obtain sufficient support for passage of § 504(a), citing, for example, Senator Nunn's statement that the escrow provision was "negotiated" very carefully in return for the debarment provision. *Oversight of the Teamsters' Union, 1983: Hearing on S. 336 Before the Senate Comm. on Labor and Human Resources,* 98th Cong., 1st Sess. 16 (1983). While recognizing it may have been necessary politically to keep the escrow provision of § 504(d) in the bill in order to pass § 504(a), the Union Defendants argue that the Constitution does not permit the government to broker the Constitutional rights of union members for political expediency.

Congress was aware of potential constitutional problems with § 504(d). Arthur Fox, testifying before Congress, offered the following constitutional criticism of the provision:

> "I frankly do not think that Congress should be in the business of ordering union members, or fund participants or beneficiaries, to pay someone for services that are not rendered. Such an order might even raise constitutional questions; for example, taking property without due process of law.... Thus, it is likely that upon conviction and removal of a union officer pursuant to this bill, many, if not most positions will be filled by other individuals. The replacement will undoubtedly qualify to draw a salary. If a like sum of money must also be placed in an escrow account which the convicted officer might be able to claim later, the union member or fund participant will, in effect, be taxed twice for services of only a single individual."

*Labor–Management Racketeering Act of 1983: Hearings Before the Subcomm. on Labor of the Senate Comm. on Labor & Human Resources,* 98th Cong., 1st Sess. 127–28 (1983).

In order to avoid constitutional problems, Mr. Fox suggested that the escrow provision be made permissive rather than mandatory. Congress rejected this suggestion.

Both the Secretary of Labor and the Department of Justice initially opposed the escrow provision of § 504(d). Secretary of Labor Donovan stated: "Quite frankly, we opposed this position last year because it would cause labor organizations ... to make double payments, one to the account for the benefit of a disqualified person and the other to the person who was actually performing the work." *Id.* at 73–74. However, the Department of Justice eventually supported the inclusion of the escrow provision in the amendment to § 504. Assistant Attorney General Lowell Jensen testified that enactment of the escrow provision would effectively balance the interests of those in question. *Id.* at 99.

Congress undoubtedly engaged in a careful and well-reasoned balancing of competing interests in the passage of § 504(d). Congress perceived a potential inequity resulting from the automatic disqualification of a union member due to his or her conviction and acted to correct it. Because Congress has vast discretion in adjusting and distributing the economic benefits and burdens inherent

in legislation (e.g., federal minimum wage requirements), no court should attempt to reweigh the economic costs and benefits of a challenged act or measure it against a particular social or economic philosophy. *Long Island Oil Prods. Co. v. Local 553 Pension Fund,* 775 F.2d 24 (2d Cir.1985). Nevertheless, this court must scrutinize the legislation, however well-intentioned, for compliance with the mandates of the Fifth Amendment.

### 2. Does Section 504(d) Effect a Taking of Private Property Without Just Compensation in Violation of the Takings Clause of the Fifth Amendment?

■ The Fifth Amendment provides that the government shall not take private property for public use without compensating the property owner. Although controversies under this clause historically arose from the government's exercise of eminent domain, the Takings Clause reaches beyond the protection of real property to other forms of private property, such as financial assets.[7] *See Webb's Fabulous Pharmacies. Inc. v. Beckwith,* 449 U.S. 155, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980); *see also United States v. Security Indus. Bank,* 459 U.S. 70, 103 S.Ct. 407, 74 L.Ed.2d 235 (1982).

■ The purpose of the Fifth Amendment provision forbidding uncompensated takings of private property for public use is "to bar Government from forcing some people to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960). Of course, every Congressional adjustment to the burdens and benefits of economic relations does not violate the Takings Clause; in fact, such legislation comes to the court with a presumption of constitutionality. Moreover, a statute that involves regulation of economic relations must be evaluated for constitutional infirmity on facts before the court, not as the statute might apply to hypothetical situations. *Concrete Pipe,* —— U.S. ——, 113 S.Ct. 2264, 124 L.Ed.2d 539; *Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986); *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976).

■ In this case, the Union Defendants contend that, while it may be a "good idea" to reimburse a person for lost salary when he or she successfully appeals a criminal conviction, that is not a burden which can, consistent with the Takings Clause of the Fifth Amendment, be placed upon the person's employer. The injury caused to a union official who suffers a criminal conviction that is later set aside may in some cases deserve recompense, but to finance such recompense out of the dues of union members places on unions a burden which, "in all fairness and justice, should be borne by the public as a whole." *Armstrong,* 364 U.S. at 49, 80 S.Ct. at 1569.

To support this contention, the Union Defendants point out that McMahan's prosecution was a service to the public generally, not a service performed for the private benefit of the Union:

> Criminal laws are not passed by the Legislature solely for the benefit of individual citizens or individual organizations but for the good of the public as a whole. Only a duly appointed or elected prosecutor representing the public is empowered to de-

---

7. Plaintiff argues that, because the Union and its members cannot "sell" their interest in the Union's treasury, no property interest should be recognized. Defendants argue that the Union's members have a sufficient interest in the financial strength and integrity of the Union's treasury because, for instance, the financial strength of the treasury determines the position which the Union and its members can take during negotiations, such as whether they can negotiate to a strike position for higher wages, benefits, and working conditions or whether they must suc-

cumb to concessionary bargaining. Likewise, the strength of the Union's treasury is often the determining factor in whether the Union can take a meritorious grievance to arbitration or sacrifice a grievance because of a financial inability to engage in the arbitration process. For purposes of this dispute, this court will consider the Union treasury, consisting of the dues and assessments contributed by the Union's members, to be private property entitled to constitutional protection.

**540**

cide whether to bring charges in a particular case.

*United States v. Price,* 788 F.2d 234, 236 (4th Cir.1986).

Since only the government had the power and authority to decide to prosecute McMahan and since the prosecution was for the benefit of the public as a whole, the Union Defendants argue, equity demands that if McMahan is to be reimbursed for lost salary, it is the public, not the Union, which must bear the expense of the reimbursement. The Union Defendants compare their situation to that in *Nollan v. California Coastal Comm'n,* 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987), in which the state of California enacted a regulation that prevented the plaintiffs from rebuilding their house on their beachfront property unless they first gave the public an easement across a strip of the property adjacent to the ocean. The Court stated that the fact that a regulation may be a "good idea ... does not establish that [private individuals] ... alone can be compelled to contribute to its realization." *Id.* at 841, 107 S.Ct. at 3151. In *Nollan,* the Court went on to note that California was free to advance its program for public purposes, but "[California] must pay for it." *Id.* Following this reasoning, Defendants argue that, although the federal government is free to pass regulations reimbursing criminal defendants for lost salary, the federal government, not the victim of the crime, must then pay for the realization of the program.

Defendants' reasoning is faulty in one crucial respect. To call the government's regulation one that "reimburses criminal defendants for lost salary" is a bit broad, because not all criminal defendants' convictions trigger a salary escrow requirement from their employers. Only criminal convictions of *union employees who are barred from office as a result of such conviction* trigger an escrow requirement. The unions benefit from the automatic disqualification of certain convicted persons, because such disqualification excises corrupt management from the labor organizations. Thus, it is not the government's interest that is being served; it is the unions' interest and the unions must pay the price.

Unquestionably, a union subject to the escrow provision is actually deprived of those assets necessary to satisfy its statutory obligation. If liability arises under § 504(d), it constitutes a real debt that the union must satisfy, and it may not be an insubstantial obligation. But the liability runs to an escrow account, set up for the benefit of a disqualified union employee, not to the government or for the benefit of the government. Such a statutory liability to a private party does not constitute an uncompensated taking prohibited by the Fifth Amendment, which proscribes the taking of private property *for public use.* "In the course of regulating commercial and other human affairs, Congress routinely creates financial burdens for some that directly benefit others. For example, Congress may set minimum wages, control prices, or create causes of action that did not previously exist. Given the propriety of the governmental power to regulate, it cannot be said that the Takings Clause is violated whenever legislation requires one person to use his or her assets for the benefit of another." *Connolly,* 475 U.S. 211, 223, 106 S.Ct. 1018, 1025, 89 L.Ed.2d 166 (1986).

■■■ The Supreme Court articulated an analytical framework for identifying whether a liability created by statute constitutes a taking in *Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986). In *Connolly,* the Court took up the constitutionality of withdrawal liability provisions of ERISA which were enacted to ensure the financial integrity of the nation's pension plans. The Court held that by invalidating contracts which purported to limit the employers' liability for contributions to the various funds, Congress did not act in an unconstitutional manner. In reaching its decision, the unanimous Court observed that in all the Court's prior taking cases, the Court has

eschewed the development of any set formula for identifying a "taking" forbidden by the Fifth Amendment, and ha[s] relied instead on ad hoc, factual inquiries into the circumstances of each particular case. To aid in this determination, however, we have identified three factors which have "particular significance": (1) "the economic

impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action."

*Id.* at 224–25, 106 S.Ct. at 1025. (Citations omitted). Application of these factors to § 504(d) reinforces this court's belief that the imposition of an escrow requirement does not constitute a compensable taking under the Fifth Amendment.

### a. The character of the governmental action

The unions could have no better scenario than the one at hand in which to discuss the character of § 504(d). There is no question that the debarred officer engaged in the scheme of which he was accused. In addition, there is no question that "the union and its members were not receiving what they were entitled to, that is the honest and faithful services of their official [McMahan] in the exercise of [his] official duties." *United States v. Price*, 788 F.2d at 237 (4th Cir. 1986). McMahan's use of Local 601's funds during his period of debarment, which he defied, was simply unconscionable. Unfortunately, the government prosecuted McMahan under the wrong theory and eventually lost, thereby entitling McMahan to the benefits of § 504(d). As a result, in this case § 504(d) operates to re-victimize the members of the union, who were forced to pay McMahan fees in excess of union-required fees to gain membership and now are being asked to turn their dues over to McMahan for his lost salary. The Union Defendants argue that not only does § 504(d) not advance the purposes of § 504, but, especially here, it makes a mockery of those purposes.

Following *Nollan*, the Union Defendants further argue that once it is determined that the escrow provision does not serve the same governmental purpose as the § 504 generally, the provision is not valid and instead becomes, in the words of the Supreme Court, " 'an out-and-out plan of extortion.' " *Nollan*, 483 U.S. at 837, 107 S.Ct. at 837–38 (citations omitted). In the instant case, the

Union Defendants argue that since the government forbade the union from continuing to employ McMahan under penalty of having its officers face criminal charges, incarceration, and fines, any later attempt to force the union to reimburse McMahan for his lost salary is extortionate at best. However, as the court has already noted, the Union Defendants consistently ignore the dual nature of the underlying justification for the 1984 amendments to § 504. It is true that the primary reason for the amendments may have been to curb corruption in labor organizations. But Congress' purpose was also to protect the interests of union employees whose jobs are stripped from them, in the name of quickly stamping out corruption, before the appeals process is completed. Further, in evaluating the constitutionality of § 504(d), this court must consider more than whether the result is equitable. Application of § 504(d), if such application eventually results in McMahan receiving funds, indeed produces a seemingly perverse result.[8] Certainly, Congress never anticipated a situation like McMahan's when it passed § 504(d). But if the goal of § 504(d) was to recompense a subsequently exonerated individual who lost his job before being allowed to appeal, then § 504(d) has functioned as planned.

▪▪▪ In analyzing the character of an alleged government taking, courts typically look at whether the government has physically invaded or permanently appropriated private assets for its own use. Of course, a taking within the meaning of the Fifth Amendment is not limited to the obvious case where the government physically invades or appropriates and permanently retains private assets for its own use. In *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), Justice Holmes articulated the principle that governmental regulations may be so severe that a regulatory taking occurs: "The general rule, at least, is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Id.* at 415, 43 S.Ct. at 160. As the Supreme Court has noted, property need not be literally "taken"

---

**8.** Of course, Local 601 could have avoided this result by terminating McMahan pursuant to the

mechanisms available to it under its own constitution. *See infra* part V.A.2.b.

by the government in the narrowest sense for a constitutionally objectionable taking to occur. *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 316, 107 S.Ct. 2378, 2386–87, 96 L.Ed.2d 250 (1987). When government regulation denies all economically viable use of the property, the regulation goes "too far." *Lucas v. South Carolina Coastal Council*, —— U.S. ——, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).

■ Whenever the government enforces private claims to property of one person against another, it acts to deprive someone of property. *Sniadach v. Family Finance Corp.*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969). Applying this principle to the Takings Clause in *Loretto v. Teleprompter Manhattan C.A.T.V. Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), the Supreme Court held that state legislation which prevented landlords from interfering with the installation of cable television facilities upon their property or premises was a taking under the Takings Clause. The city had argued that since a private company rather than the city or state actually occupied the premises, it did not constitute a taking under the Takings Clause. The Supreme Court found otherwise: "We disagree. A permanent physical occupation authorized by state law is a taking without regard to whether the State, or instead a party authorized by the State, is the occupant." *Id.* at 432 n. 9, 102 S.Ct. at 3174 n. 9.

The Union Defendants contend that § 504(d) denies all economically viable use of the union funds it reaches. Under § 504(d), the union is deprived of the control and use of its money as soon as an officer convicted of one of certain enumerated offenses appeals the conviction, and the union becomes completely divested and deprived of its money if the appeal succeeds. The Union Defendants argue that even if the appeal fails, § 504(d) still effects a taking, because the money is nevertheless out of union control for a temporary period. *See First English Evangelical Lutheran Church*, 482 U.S. at 318, 107 S.Ct. at 2387–88 (" '[T]emporary' takings which, as here, deny a landowner all use of his property, are not different in kind from permanent takings....").

This court views § 504(d) as more akin to the regulation in *Connolly* than the takings in *Nollan, Lucas,* and *First English Evangelical Lutheran Church.* *Connolly* involved ERISA amendments that required employers who chose to withdraw from multi-employer pension plans to pay a proportionate share of the plan's unfunded but vested benefits. The legislation was intended to insure that liabilities generated by employers no longer participating in the plan would not be forced on the remaining employers, leading to a vicious spiral of further withdrawals. *Id.* 475 U.S. at 214–15, 106 S.Ct. at 1021, 89 L.Ed.2d at 173. The Court found that the interference with the property rights of the withdrawing employer was constitutional, saying it arose "from a public program that adjusts the benefits and burdens of economic life to promote the common good." 475 U.S. at 225, 106 S.Ct. at 1026. Likewise, § 504(d)'s interference with the property rights of a union arises from a program that adjusts the benefits and burdens of economic life to promote a valid goal. The government does not "physically invade or permanently appropriate any of the [union's] assets for its own use." *Connolly*, 475 U.S. 211, 224, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986). Instead, § 504(d) safeguards the rights of a union employee barred from employment pursuant to § 504(a). Again, in facing such legislation, the judiciary must defer to the legislature in the latter's efforts to regulate economic affairs, determining only whether Congress acted in furtherance of a legitimate legislative purpose. *Long Island Oil Prods.*, 775 F.2d 24 (2d Cir.1985). In the present case, it can be said that a legitimate purpose is substantially advanced by means of § 504(d).

### b. The severity of the economic impact of § 504(d) on the union

The second *Connolly* factor is "the severity of the economic impact" caused by the governmental action. The Union Defendants contend that § 504(d)'s economic impact is not only severe, but "life-threatening" in some cases. During the time when the debarred employee's criminal appeal is pending, not only is the union prevented from using its escrowed funds but, indeed, in the

case of a poor union such as Local 601, the union can be put out of business. While McMahan was incarcerated and appealing his conviction, the affairs of Local 601 did not come to an abrupt halt. Local 601 was still required to negotiate collective bargaining agreements with employers, to police those agreements, to process grievances on behalf of its members, and to engage in the full spectrum of activities which are required of a labor organization. However, Local 601 could not afford to pay two salaries. (*See* Walker Declaration).

Local 601 contends that it was required to choose between complying with § 504(d) and ceasing to function, or continuing to perform its duties to its members by paying the one and only salary which it could afford to the person actually performing the job. Accordingly, the argument goes, both the restriction on Local 601's ability to use its money while McMahan was incarcerated and the requirement that Local 601 then turn over a major portion, if not its entire treasury, to McMahan, "extinguishes a fundamental attribute of ownership" in its property.[9] *Agins v. City of Tiburon*, 447 U.S. 255, 262, 100 S.Ct. 2138, 2142, 65 L.Ed.2d 106 (1980); *Kaiser Aetna v. United States*, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979).

There is no doubt that § 504(d) completely deprives a union of whatever amount of money it is obligated to pay to fulfill its statutory liability. However, its statutory liability is subject to adjustment through the use of internal controls. Because a union has internal mechanisms that permit termination of an employee, it has unilateral control over the amount of economic impact that might occur. Section 504(d) provides that salary must be escrowed "for the duration of the appeal or for the period of time *during which such salary would otherwise be due,* whichever is shorter." (Emphasis added.) Had Congress intended to restrict the use of internal procedures to terminate that period of time during which salary would otherwise be due, the statute could have read "or for the remainder of his current term in office,

whichever is shorter." At least theoretically, Local 601 itself could have ended the period in which the salary would have been due by prosecuting internal union charges against McMahan pursuant to its own constitution. (Art. XXVI, § 14).

The Union Defendants contend that such an argument is not rational. First, if the internal procedures of unions were always adequate to rid unions of corrupt individuals, there would be no need for the debarment provision of § 504(a). *See, e.g., Government's Ability to Combat Labor Management Racketeering: Hearings Before the Permanent Subcomm. on Investigations of the Senate Comm. on Governmental Affairs,* 97th Cong., 1st Sess. 164 (1981) (Statement of Lane Kirkland supporting immediate removal of officers and admitting that unions lacked the resources to rid themselves of corruption).

Second, by requiring a union to invoke its own internal disciplinary procedures as the only way to cut off potential liability, the statute actually rewards the most corrupt union official who has the most dictatorial control over the union's membership and may prevent the membership from invoking the disciplinary procedures.

Finally, as evidenced here, the internal procedures can be circumvented by the convicted official. Here, the Union Defendants' Constitution provided for the appointment of a successor to fill out McMahan's term. However, as noted in the factual section of this opinion, although Local 601 complied with the Constitution and appointed three "successors," McMahan actually continued to run Local 601 and continued to draw a salary even after his conviction.

In the great tradition of the legal profession, McMahan argues with a straight face that Local 601's failure to internally prosecute and terminate him indicates that the union valued his services and wished to preserve them. Such an argument certainly raises the collective eyebrow of the court; however, McMahan is correct in asserting that Local 601 should not be allowed to exag-

---

9. Indeed, as Local 601's LM Report form filed with the Department of Labor in June 1989 indicates, Local 601 will be forced to liquidate its assets, including the building in which it operates, if it is forced to pay McMahan's back salary (*See* Exhibit J to Walker Declaration).

gerate the economic impact of 504(d) when it failed to do all within its power to avoid the severity of the impact.[10]

### c. The extent to which the regulation has interfered with distinct investment-backed expectations

The extent to which the regulation interferes with "distinct investment-backed expectations" is the final *Connolly* factor in analyzing a statutory imposition of liability to private parties. In *Connolly*, the Court found that "prudent" employers seeking to escape without consequences from underfunded pension plans had "more than sufficient notice" that there might be "additional financial obligations" based on their withdrawal. *Connolly*, 475 U.S. at 227, 106 S.Ct. at 1027. This finding was based on the fact that the entire field of pensions has been comprehensively regulated since the passage of ERISA in 1974. The 1980 amendments challenged in *Connolly* merely shored up ERISA "to ensure that employees would receive benefits promised them." *Id.* The regulation at issue in *Connolly* did not create a new liability; it simply prevented employers from escaping their preexisting duty to maintain the financial integrity of pension trust funds. The Court held that "[t]hose who do business in a regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." *Id.*

Because the National Labor Relations Act provides unions and their members with substantive protections to organize and to utilize federal agencies to compel recognition of labor organizations as the bargaining representatives of their members, unions and their members may also have to tolerate Congressional interference that may be adverse to union interests. The Union Defendants argue, however, that § 504(d) does not regulate unions as unions, *i.e.*, in their capacity as collective bargaining representatives; rather, § 504(d) regulates unions in their capacity as employers. As pointed out by the Union Defendants, the reason Congress drafted § 504(d) was to create balance with § 504(a), which protects union members from corrupt

officials and thus allows the collective bargaining process to function. Other employers are not subject to congressionally mandated escrow requirements because other employers never received from Congress statutory protection from corruption within their own ranks. Thus, viewed in this light, § 504(d), like the provision considered in *Connolly*, is a "subsequent amendment to achieve legislative ends," here, in the already highly regulated field of labor relations.

The Union Defendants point out as a contrast between *Connolly* and the present case that, whatever Congress may have intended, § 504(d) fails to "buttress" the purpose of § 504 as a whole, that is, to protect unions from corruption. Even if intended to ameliorate the harsh fate of the union employee debarred by § 504(a) who succeeds on appeal, § 504(d), the Union Defendants argue, makes a hash of the reasonable "investment-backed expectations" of union members who join a union not for a week, or a year, but in many cases, for a lifetime.

This court recognizes that workers who join a union have reasonable expectations of the services to be provided by their local union and the uses to which their dues and assessments will be put. The worker's expectations probably do not include payment of salary to union officials who are banned from serving the union while they appeal convictions for defrauding the members. However, this court cannot accept the Union Defendants' argument that a worker's membership in a union is an investment every bit as much as a landowner's acquisition of real property. While it is true that taking jurisprudence has extended far beyond eminent domain and real property, to hold that a union member has such a distinct investment-backed expectation in the union treasury that Congress cannot regulate the use of that money, especially when Congress has historically regulated union affairs and when the measure was written in an effort to pass another regulatory measure that protects union members, is more than this court is prepared to do.

---

**10.** Another way to avoid paying two salaries (other than terminating the debarred employee) is to have a substitute perform the duties of the debarred official without pay, as occurred in the case at hand.

Further, even if the investment-backed expectations of union members were deemed reasonable, it cannot be said that the escrow provision of § 504(d) necessarily interferes with these expectations. Again, the very same union members who have expectations about the use of their dues can act to remove the convicted union official from office and terminate the escrow requirement.

The Union Defendants submit that a member cannot simply walk away from the union if its treasury is diverted for years into an escrow account and the union's ability to provide its promised services is crippled as a result. To avoid being so crippled, perhaps unions will have to raise dues in anticipation of facing the "dreaded" escrow requirement. Finally, if no other solution proves satisfactory, the unions may wish to lobby for a repeal of the beneficial and burdensome aspects—subsections (a) and (d)—of section 504, although it appears that it was the unions which lobbied for inclusion of § 504(d). *See* Part V.A. 1 (statement of Lane Kirkland).

When playing in a highly regulated, legislative-intense field, investors take risks that governmental forces will mandate how their investment is spent. The business of unionizing has long been subject to Congressional intrusion, sometimes, as in the case of § 504, at the invitation of the unions. If unions seek special statutory enactments to govern their operations, they should not complain when Congress gives them what they sought,[11] unless the additional provisions offend the Constitution. Here, § 504(d), though a troublesome and controversial enactment, comports with constitutional guarantees as currently interpreted by the courts.

This court is not convinced that fairness and justice require the public, rather than the unions who are protected by § 504(a)'s debarment provision, to shoulder the responsibility for protecting the appealing union employee's rights. Congress imposed escrow liability as one part of an overall scheme to safeguard unions from corruption and convicted employees from unnecessary infringement of rights. This court sees no constitutionally compelled reasons to require

the taxpayers to assume the financial burden of attaining this goal.

### 3. Does Section 504(d) Constitute a Deprivation of Property Without Due Process of Law In Violation of the Fifth Amendment?

The Fifth Amendment's Due Process Clause offers three protections that Defendants assert are absent in the present case: (a) procedural due process, (b) substantive due process, and (c) equal protection.

#### a. Procedural Due Process under the Fifth Amendment Due Process Clause

The Due Process Clause of the Fifth Amendment imposes on the federal government an obligation to provide procedural safeguards before depriving an individual of property. Procedural due process generally requires that a hearing be held before the government deprives an individual of property. *United States v. James Daniel Good Real Property*, —— U.S. ——, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993).

The 'right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society.' The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'

*Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) (citations omitted).

Although the central notion of constitutional due process is "prior notice and a hearing," the Supreme Court has stated that "due process" is a flexible concept—that the procedures required by the clause vary depending upon the importance attached to the interest being terminated and the circumstances under which the deprivation may occur. *Walters v. National Ass'n of Radiation Survivors*, 473 U.S. 305, 320, 105 S.Ct. 3180, 3188–89, 87 L.Ed.2d 220 (1985). "The purpose of this requirement is not only to ensure abstract fair play to the individual. Its purpose, more particularly, is to protect his use

---

**11.** To paraphrase an old saying: "Be careful what you ask for because you may get it."

and possession of property from arbitrary encroachment—to minimize substantively unfair or mistaken deprivations of property...." *Fuentes v. Shevin,* 407 U.S. 67, 80–81, 92 S.Ct. 1983, 1994, 32 L.Ed.2d 556 (1972).

■ The Union Defendants contend that the escrow provision of § 504(d) deprives a union of a property interest—the use of its money—without affording the procedural protections required by the Due Process Clause. Plaintiff contends that the existing procedure provides all the process that is constitutionally due before a union can be deprived of such an interest.

■ The Supreme Court has set forth a three-part inquiry for determining what process a particular deprivation warrants. *Mathews v. Eldridge,* 424 U.S. 319, 334, 96 S.Ct. 893, 902–03, 47 L.Ed.2d 18 (1976). The prescribed analysis requires consideration of (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Id.* As will be seen, consideration of the second factor effectively eliminates the need to consider the first and third.

Initiation of the escrow provision is not dependent upon an administrative decision, as are most deprivations challenged on procedural due process grounds. Here, the property deprivation is automatic upon debarment of a Union employee. No administrative decision, which may lack fairness or reliability, must be made to determine whether a union must escrow the convicted employee's salary. No discretion need be exercised. No "issues of witness credibility and veracity, [which] often are critical to the decisionmaking process," arise. *Id.* at 343–44, 96 S.Ct. at 906–07. Thus, there is no risk of erroneous deprivation. "[P]rocedural due process rules are shaped by the risk of error inherent in [a] truthfinding process as applied to the generality of cases." *Id.* at 344,

96 S.Ct. at 907. Here, there is no truthfinding function and thus no room for mistake in application of the statutorily automatic "escrow-upon-debarment" scheme.

The Union Defendants rely on *Concrete Pipe,* —— U.S. ——, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993), to argue that a property deprivation which is automatically triggered by statute nevertheless requires a pre-deprivation hearing. In *Concrete Pipe,* an employer challenged an ERISA withdrawal liability provision on grounds that the initial determination which financially deprived the employer was made by a potentially biased adjudicator. The Court upheld the scheme requiring payment of the withdrawal liability only because an impartial arbitrator evaluated the initial determination prior to the deprivation. Based on this holding, the Union Defendants argue that they are entitled to an impartial adjudicator prior to a financial deprivation. This reliance, however, is misplaced. In *Concrete Pipe,* the employer was challenging the mechanism by which the *amount* of its withdrawal liability was calculated. The Court held that the employer had the right to have an impartial arbitrator determine whether the initial, potentially biased adjudicator accurately calculated the amount of the liability. Here, there is no calculation of the amount to be escrowed. The deprivation is not only triggered by a certain event, but it is for a predetermined sum. Thus, unlike the situation in *Concrete Pipe,* no exercise of discretion calls for a pre-deprivation impartial adjudicator.

■ The Union Defendants further argue that § 504(d) lacks adequate procedural protections because some situations require a weighing of equitable considerations before an automatic escrow. They argue that there is no procedure for seeking an exemption from the statute's requirements based upon either the equities or an inability to comply. The fact that the union can defy the statute and, as here, protest compliance with the statute when it is sued does not, the Union Defendants argue, satisfy due process requirements. However, the fact that a union can obtain judicial review when the formerly convicted official seeks to enforce the escrow

provision does comport with due process. As previously stated, the mandates of the Due Process Clause are flexible, and a post-deprivation hearing is adequate in some instances while inadequate in others. *See Mathews,* 424 U.S. at 333–35, 96 S.Ct. at 901–03 (and cases cited therein). The escrow provision at hand is a prime example of a depriving mechanism that so rarely produces "wrongful" deprivation that a post-deprivation hearing satisfies due process. The fact that any unusual situation, such as McMahan's, can be addressed by judicial review saves this depriving mechanism from constitutional invalidation, because all that is required to satisfy due process is a procedure that prevents erroneous deprivation in "the generality of cases, not the rare exceptions." *Id.* at 344, 96 S.Ct. at 907.

As a final challenge on procedural due process, the Union Defendants argue that the statute creates an irrebuttable presumption that unions can and must continue to pay two salaries for which they receive the performance of only one individual, and that every union employee whose conviction is reversed is worthy of and entitled to reimbursement for his salary lost as a result of the government's decision to prosecute.

■■■ As the Supreme Court has noted, "[s]tatutes creating permanent irrebuttable presumptions have long been disfavored under the due process clauses of the Fifth and Fourteenth Amendments." *Vlandis v. Kline,* 412 U.S. 441, 446, 93 S.Ct. 2230, 2233, 37 L.Ed.2d 63 (1973). For instance, in *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971), the Supreme Court struck down a statute which presumed fault for an automobile accident if an uninsured motorist was involved in the accident and could not post security. Because no hearing was provided on the crucial factor of fault, the Supreme Court held that the statute denied due process of law. Likewise, in *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), the Supreme Court struck down a statute which provided an irrebuttable presumption that all unmarried fathers were unqualified to raise their children. Again, because no hearing mechanism was provided to determine the fathers' parental fitness, the

Court found the statute to be a denial of due process. Such irrebuttable presumptions do not "always operate to effectuate the State's asserted interest," *Vlandis v. Kline,* 412 U.S. at 449, 93 S.Ct. at 2235, and are "often contrary to fact," *United States Dep't of Agriculture v. Murry,* 413 U.S. 508, 514, 93 S.Ct. 2832, 2836, 37 L.Ed.2d 767 (1973). The Due Process Clause therefore requires that a mechanism be provided so that an individual has some opportunity to present evidence to rebut the presumption.

The Union Defendants contend that § 504(d)'s irrebuttable presumption that a union employee who ultimately prevails on appeal is entitled to reimbursement for lost wages from the union does not, in the Supreme Court's words, "operate to effectuate the [government's] asserted interest." *Vlandis,* 412 U.S. at 449, 93 S.Ct. at 2235. However, as noted previously, the purpose of § 504 is two-fold: to remove corrupt individuals from the labor organizations and to protect the interests during appeal of an individual who may have been improperly removed from union office. Though McMahan's case is surely not the type of situation Congress envisioned when it enacted § 504(d), it cannot be said that the underlying purpose of § 504(d) is not served by requiring McMahan's employer to escrow his salary which he would otherwise receive but for § 504(a). Therefore, the "irrebuttable presumption" inherent in § 504(d) generally effectuates the government's interest and does not violate procedural due process.

### b. Substantive Due Process under the Fifth Amendment Due Process Clause

■■■ Due process is not merely a procedural safeguard; it reaches those situations where a deprivation of life, liberty, or property is accomplished by legislation which can, given even the fairest procedure in application to individuals, destroy the enjoyment of all three. *Poe v. Ullman,* 367 U.S. 497, 541, 81 S.Ct. 1752, 1775–76, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting). Substantive due process demands that the law shall not be unreasonable, arbitrary, or capricious, and that the means selected shall have some relation to the object sought to be attained.

*Nebbia v. New York,* 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934). In other words, a deprivation of life, liberty, or property is constitutionally supportable only if the conduct from which the deprivation flows is proscribed by reasonable legislation reasonably applied. *See Pennell v. San Jose,* 485 U.S. 1, 14, 108 S.Ct. 849, 858–59, 99 L.Ed.2d 1 (1988) (state-imposed price controls violate due process if they are "arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt").

■ Legislation adjusting the burdens and benefits of economic life comes to the court with a presumption of constitutionality, and one complaining of a substantive due process violation must establish that the legislature has acted arbitrarily and irrationally. *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976); *Concrete Pipe,* —— U.S. ——, 113 S.Ct. 2264, 124 L.Ed.2d 539; *National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.,* 470 U.S. 451, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985). It is true that some legislation may impose liability that was not anticipated at the time of passage. However, legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations. This is true even though the effect of the legislation is to impose a new duty or liability based on past acts.

■ The test of constitutionality, with regard to an alleged due process violation, is not whether Congress was wise or fair in the economic sense in enacting legislation, but simply whether the statute is rational. *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976). In *Usery,* the Supreme Court illuminated the limited rationality required to survive a due process challenge by upholding a statute requiring coal mine operators to compensate former employees disabled by pneumoconiosis. The Court found that "the imposition of liability for the effects of disabilities bred in the past is justified as a rational measure to spread the costs of the employees' disabilities

to those who have profited from the fruits of their labor—the operators and the coal consumers." *Id.* at 18, 96 S.Ct. at 2893.

■ In the case at hand, the Union Defendants argue that § 504(d) is arbitrary, irrational, and fails to meet the standard of substantive due process because it not only fails to advance the purposes of the LMRDA in promoting a union environment free of corruption; it is "demonstrably irrelevant" to § 504's legislative purpose of expunging corruption from the labor movement. The Union Defendants further suggest that it is impossible to articulate a succinct, comprehensible, and legitimate reason why the government may require unions to pay for services which, by law, the unions may not receive.

■ In articulating the legislative purpose of any particular act, one must consider all of the justifications for its passage. It is clear that the purpose of § 504(a) was, as the unions state, to promote a union environment free of corruption. It is also clear that the debarment provision of § 504(a) substantially advances this legitimate purpose. However, as previously indicated, the legislative history surrounding the enactment of § 504(d) evidences an independent legitimate legislative purpose—to correct a perceived inequity resulting from the automatic disqualification of a union member due to his or her conviction if that conviction is overturned on appeal. Thus, Congress intended at least two purposes in passing the § 504 amendments: to protect union members from corrupt officials and to protect the interests of a convicted union employee whose conviction was improperly obtained by the government and later reversed. Therefore, when determining whether the escrow provision is rationally related to the legislative purpose of Congress' amendments to § 504, one must consider the purpose to be a balancing of the competing interests of union members and the affected officer. Evaluated in light of this collective purpose, the escrow requirement survives a due process challenge.[12]

---

**12.** Even using the Union Defendants' articulation of the singular purpose behind § 504, one can make a sound argument that the escrow require-

ment is nevertheless rationally related to this legislative purpose. If Congress' intent in proposing § 504(a) was to protect union members

Using the deferential standard of review applied in substantive due process challenges to economic legislation, the imposition of escrow liability here is rationally related to the legislative objective of balancing competing interests among innocent union members and convicted union employees. Because there is a reasonable fit between justification and means, § 504(d) survives the substantive due process challenge.

### c. Equal Protection under the Fifth Amendment Due Process Clause

 The Union Defendants argue that § 504(d) suffers one further constitutional infirmity: it denies unions the equal protection of the law. McMahan counters this argument by simply noting that unions are not a suspect class and the classification, if any, under § 504(d) is neither arbitrary nor irrational.

Although the Fifth Amendment does not spell out a guarantee of equal protection, the equal protection doctrine nevertheless applies to the federal government via the Due Process Clause:

> The Fifth Amendment, which is applicable to the District of Columbia, does not contain an Equal Protection Clause as does the Fourteenth Amendment which applies only to the states. But the concepts of equal protection and due process, both stemming from our American ideal of fairness, are not mutually exclusive. The 'Equal Protection of the Laws' is a more explicit safeguard of prohibited unfairness than 'due process of law' and, therefore, we do not imply that the two are always interchangeable phrases. But, as this Court has recognized, discrimination may be so unjustifiable as to be violative of due process.

*Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

 The purpose of the Equal Protection Clause is to prevent the government from making improper classifications. The Union Defendants contend that, by treating unions differently from every other similarly situated employer, § 504(d) denies unions the equal protection of the law. To support this contention, the Union Defendants offer an analogy with General Motors, a private employer. If an employee of General Motors were found to have charged franchisees excessive fees and then converted the excess fees to his own benefit and use, General Motors would have the right to terminate that employee's services. If that employee ultimately prevailed on a criminal appeal on a technical legal argument, such as that prevailed on by McMahan, no governmental statute would require that General Motors reimburse the employee for lost salary during the time he was incarcerated in prison. Using this analogy, the Union Defendants argue that it is simply inconceivable that, under our "American ideal of fairness" and consistent with our notions of equal protection, labor unions can be singled out as the only employers in American society which must pay an ex-employee a salary for services never performed while that individual is incarcerated pending appeal.

This argument misses the boat in several respects. First, in suggesting there is differential treatment because General Motors would have the right to terminate its employee, the Union Defendants fail to mention that Local 601 also had the right to terminate McMahan through internal procedures. *See supra* Part V.A.2.b. Second, in suggesting there is differential treatment because no statute would require General Motors to reimburse an incarcerated employee whose conviction was subsequently overturned, the Union Defendants fail to mention that no statute automatically bars a General Motors employee from his position because of a conviction. Unions are receiving differential treatment because they have historically supported differential treatment. They supported Congress' attempt to statutorily remove union officers who were convicted of certain offenses. On the other hand, General Motors (and other private employers) at-

---

from corruption by automatically removing a convicted officer, but § 504(a) was bound to die in Congress due to concern about such a harsh rule, then the escrow provision, which alleviates the harshness of § 504(a) and thus ensures its passage, was rationally related to the goal of § 504(a). This clearly was the opinion of the head of the largest and strongest union in the United States. *See* Part V.A.1. (statement of Lane Kirkland).

tempt to combat fraud within their own organizations by internal controls. General Motors does not have the tool of automatic debarment to rid itself of convicted, corrupt employees; General Motors also does not have the burden of escrowing funds to protect a disqualified employee whose conviction is overturned.

■ Further, as noted by Plaintiff, unions are not a suspect class, and neither is there a fundamental right at stake. Therefore, the standard for evaluating the constitutionality of this statute is "mere rationality"—the court must determine whether there is some rational relation between the statute's creation of a class and a legitimate legislative objective. Courts view economic classifications with extreme deference and give them a heavy presumption of constitutionality. "The classification must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." *F.S. Royster Guano Co. v. Virginia,* 253 U.S. 412, 40 S.Ct. 560, 64 L.Ed. 989 (1920).

As previously discussed, Congress had a legitimate objective in amending § 504 with the debarment and escrow provisions, and § 504(d), in softening the blow of § 504(a) and protecting the rights of debarred employees, is rationally related to this objective. Even if § 504(d) does create a class, the class is reasonable, and it is no more a class for purposes of § 504(d), which the Union Defendants dislike, than for § 504(a), which the Union Defendants like.

Thus, the Union Defendants' equal protection challenge must fail.

## B. STATUTE OF LIMITATIONS

■ Defendants argue that McMahan's claim for salary that should have been placed in an escrow account pursuant to § 504(d) is barred by the six month statute of limitations established by the Supreme Court in *DelCostello v. International Brotherhood of Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). As noted by the Fourth Circuit, Plaintiff's cause of action is implied.

Section 504 does not include a statute of limitations.

The present case does not involve the type of hybrid claim addressed in *DelCostello.* There, an employee brought suit against his employer and a union, alleging that the employer breached a provision of a collective-bargaining agreement *and* that the union had breached its duty of fair representation by mishandling the resulting grievance-arbitration proceedings. The Supreme Court found this type of lawsuit to be a hybrid—the suit against the employer was brought pursuant to 29 U.S.C. § 185, while the suit against the union was for the breach of the union's duty of fair representation. Because two claims were involved, that action resulted in a direct challenge to the private settlement of disputes under a collective-bargaining agreement for which there is no close analogy in ordinary state law. Accordingly, due to the absence of a close analogy in state law, federal law provided the appropriate statute of limitations. The Court determined that Section 10(b) of the LMRDA (29 U.S.C. § 160[b]) and its applicable six month statute of limitations controlled.

McMahan's cause of action under § 504(d) is not a hybrid lawsuit of the sort in *DelCostello.* It does not involve the stability of bargaining relationships and it does not involve private settlements of disputes under collective-bargaining agreements.

McMahan's § 504(d) cause of action is controlled by the decision of *Reed v. United Transportation Union,* 488 U.S. 319, 109 S.Ct. 621, 102 L.Ed.2d 665 (1989), in which a member brought suit against his union and its officers alleging that their refusal to pay him monies due was the result of his expressing views on local union matters. The Supreme Court determined that this violation of Section 101 of the LMRDA was governed by general or residual personal injury statutes of limitation of the state in which the action was brought. Thus, the *DelCostello* six month statute of limitations did not apply because the action was more akin to a civil rights claim or tort, which triggered the state's three year statute of limitations.

In the present case, and as the Supreme Court reaffirmed in *Reed,* the general rule

that in the absence of an expressed statute of limitations Congress intended for the courts to apply the most closely analogous state statute is applicable. Use of a borrowed federal statute of limitations is a narrow exception to the general rule and is not applicable here.

Defendants correctly note that *Reed* was decided in the context of Title I of the LMRDA, while the present case involves Title V. The absence of rights involving free speech in the present case, however, does not render *Reed* inapplicable. Both sections of the LMRDA protect personal rights of union members.

The proper statute of limitations to apply in this § 504(d) action is the six year statute of limitations, which was in effect in South Carolina at the time McMahan's § 504(d) cause of action accrued and which governs personal injury actions. S.C.CODE ANN. § 15-3-530 (Law.Co-op.1976 & Supp.1992). Accordingly, Plaintiff's § 504(d) cause of action is not barred by the statute of limitations.

## C. RES JUDICATA

■ As noted in the "Procedural Background" section of this order, McMahan filed suit in 1989 alleging violation of § 504, and he filed suit in 1991 alleging, against the International, conversion, interference with economic relations, and civil conspiracy. In previously considering a summary disposition of the 1989 action, this court adopted a magistrate judge's findings that no private right of action existed against International and that, at any rate, International was not the party responsible for escrowing McMahan's salary. On appeal, the Fourth Circuit agreed, stating:

> The district court granted the International's motion for summary judgment because the International was not the labor organization responsible for the payment of the funds into escrow. The International submitted unrebutted affidavits below that McMahan was not its employee. Section 504(d) specifically limits the escrow requirement to "the *individual* employer or

organization responsible for payment of such salary." (emphasis added.) The only possible meaning of "individual" is that Congress intended to limit the escrow obligation to the entity that employed the person and had paid the salary before the person's conviction. That entity is Local 601 only. We therefore affirm the summary judgment for the International.

*McMahan v. International Ass'n of Iron Workers,* 964 F.2d 1462, 1467–68 (4th Cir. 1992). Based on this ruling, the International contends that the second suit is barred by the doctrine of *res judicata.*

■ The doctrine of *res judicata* bars any subsequent action where a final judgment on the merits has been rendered in a previous case. For purposes of *res judicata,* a summary judgment is a considered a final judgment on the merits. A plaintiff may not evade a final judgment dismissing his claim by dressing up the same claim in different legal terms or recasting it according to a new legal theory. Thus, whether the claims raised in the 1991 suit are barred by *res judicata* depends on whether they involve "the same claim, demand, or cause of action" as raised in the 1989 suit.[13] *Greenville County v. Insurance Reserve Fund,* 427 S.E.2d 913 (S.C.Ct.App.1993).

The 1989 lawsuit involves Local 601's failure to escrow McMahan's salary. The causes of action raised in the 1991 lawsuit involve the removal of funds from the SCN bank account. The issues, though related, are not synonymous. The only final judgment among these consolidated matters is that the International is not liable for the alleged violation of § 504(d), because the escrow obligation extended only to McMahan's employer, Local 601. *McMahan,* 964 F.2d 1462. Thus, the doctrine of *res judicata* does not bar the other claims and does not entitle the International to summary judgment on the remaining causes of action asserted against it (conversion, interference with economic relations, and civil conspiracy).

---

**13.** The South Carolina Rules of Civil Procedure do not require joinder of all claims arising out of the same transaction or occurrence. SCRCP 18(a).

## VI. CONCLUSION

It is therefore

**ORDERED** that Defendants' motions for summary judgment on violation of § 504 be **DENIED.** It is further

**ORDERED** that Plaintiff's motion for summary judgment on violation of § 504 be **GRANTED** and that Plaintiff be awarded judgment against Defendant Iron Workers Union Local 601 for Local 601's violation of 29 U.S.C. § 504(d) in an amount to be determined at trial.

**AND IT IS SO ORDERED.**